RECORD NOS. 13-1007(L); 13-1115; 13-1116 XAP

In The

# United States Court Of Appeals
## For The Fourth Circuit

**ROBERT F. CHERRY, JR.; ROBERT J. SLEDGESKI;
JOHN LEWANDOWSKI; CHARLES WILLIAMS, Individually and
on behalf of all persons similarly situated; BALTIMORE CITY FRATERNAL
ORDER OF POLICE, LODGE #3, INC.; BALTIMORE CITY FIREFIGHTERS'
IAFF, LOCAL 734, on behalf of their members,**

*Plaintiffs – Appellees/Cross-Appellants,*

**BALTIMORE FIRE OFFICERS UNION, LOCAL 964,
INTERNATIONAL ASSOCIATION OF FIREFIGHTERS,**

*Intervenor/Plaintiff – Appellee,*

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE CITY, a municipal corporation,**

*Defendant – Appellant/Cross-Appellee,*

and

**BOARD OF TRUSTEES OF THE FIRE AND POLICE EMPLOYEES' RETIREMENT SYSTEM
OF THE CITY OF BALTIMORE, a body politic and corporate; EDWARD J. GALLAGHER, in his capacity as
Director, Department of Finance; THOMAS P. TANEYHILL, in his capacity as Executive Director,
Fire and Police Employees' Retirement System of the City of Baltimore,**

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

————————————

## PAGE PROOF BRIEF OF APPELLANT/CROSS-APPELLEE

————————————

| | |
|---|---|
| **James P. Ulwick** | **George Nilson** |
| **Kevin F. Arthur** | **Matthew W. Nayden** |
| **Jean E. Lewis** | **BALTIMORE CITY LAW** |
| **KRAMON & GRAHAM, P.A.** | **DEPARTMENT** |
| **One South Street, Suite 2600** | **100 N. Holliday Street** |
| **Baltimore, Maryland 21202-3201** | **Baltimore, Maryland 21202** |
| **(410) 752-6030** | **(410) 396-5370** |
| *Counsel for Appellant/Cross-Appellee* | *Counsel for Appellant/Cross-Appellee* |

*Gibson*Moore Appellate Services, LLC
421 East Franklin Street ♦ Suite 230 ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-1007__        Caption: __Robert Cherry, Jr., et al. v. Mayor & City Council of Baltimore__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Mayor & City Council of Baltimore__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
        (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                  ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature:  /s/ James P. Ulwick _____    Date:  January 14, 2013

Counsel for:  Appellant _____

## CERTIFICATE OF SERVICE
****************************

I certify that on  January 14, 2013  the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Robert D. Klausner, Esquire
Klausner & Kaufman P.A.
10059 N.W. 1st Court
Plantation, FL 33324

/s/ James P. Ulwick _____                  January 14, 2013
        (signature)                                         (date)

07/19/2012
SCC
- 2 -

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    The City's Budget and Pension Crises . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    The F&P System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      C.    The Variable Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      D.    The Variable Benefit's Negative Impact . . . . . . . . . . . . . . . . . . . . . 13

      E.    The System's Deteriorating Condition . . . . . . . . . . . . . . . . . . . . . . . 14

      F.    The Greater Baltimore Committee . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      G.    The Retention of PFM and Aon . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      H.    Bill 10-519 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      I.    The Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      J.    The Unions' Counterproposal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      K.    Enactment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

I.    STANDARD OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

II.   THE COURT ERRED IN HOLDING THAT ORDINANCE
      10-306 VIOLATES THE CONTRACTS CLAUSE  . . . . . . . . . . . 32

      A.    The Applicable Legal Standards  . . . . . . . . . . . . . . . . . . . . . 32

      B.    The Court Erred in Holding that the Ordinance
            Substantially Impaired the Obligations of Contract  . . . . . . . 36

            1.    Plaintiffs' Failure of Proof . . . . . . . . . . . . . . . . . . . . . 36

            2.    City of Charleston  . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

      C.    The Court Erred in Holding that the Ordinance
            Was Not Reasonable and Necessary to Serve What
            It Found to Be an Important Public Purpose  . . . . . . . . . . . . 45

      D.    Because Plaintiffs Claim to Retain State-Law
            Contract Claims, They Have No Contracts Clause Claim . . . 58

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

REQUEST FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ii

# TABLE OF CASES, STATUTES, AND AUTHORITIES

PAGE(S)

## CASES

*Allied Structural Steel Co. v. Spannaus,*
      438 U.S. 234 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Andrews v. Anne Arundel County,*
      931 F. Supp. 1255 (D. Md. 1996), *aff'd,*
      114 F.3d 1175 (4th Cir.), *cert. denied,*
      522 U.S. 1015 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Association of Surrogates and Supreme Court Reporters v. New York,*
      940 F.2d 766 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Baltimore Teachers Union v. Mayor & City Council of Baltimore,*
      6 F.3d 1012, (4th Cir. 1993), *cert. denied,*
      510 U.S. 1141 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Board of Trustees of the Empls. Ret. Sys. v.*
*Mayor & City Council of Baltimore,*
      317 Md. 72 (1989), *cert. denied,*
      493 U.S. 1093 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Broussard v. Meineke Discount Muffler Shops, Inc.,*
      155 F.3d 331 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Buffalo Teachers Fed. v. Tobe,*
      464 F.3d 362 (2d Cir. 2006), *cert. denied,*
      550 U.S. 918 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 57, 58

*Catawba Indian Tribe v. City of Rock Hill,*
      501 F.3d 368 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

iii

*City of Charleston v. Public Serv. Comm'n*,
   57 F.3d 385 (4th Cir.), *cert. denied*,
   516 U.S. 974 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*City of Frederick v. Quinn*,
   35 Md. App. 626 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 45

*Crosby v. City of Gastonia*,
   635 F.3d 634, 642 & n.7 (4th Cir.), *cert. denied*,
   ___ U.S. ___, 132 S. Ct. 112 (2011) . . . . . . . . . . . . . . . . . . . . . . . 31, 58, 59

*Davis v. Mayor and Aldermen of the City of Annapolis*,
   98 Md. App. 707 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Energy Reserves Group, Inc. v. Kansas Power and Light Co.*,
   459 U.S. 400 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Fraternal Order of Police Lodge No. 89  v. Prince George's County*,
   608 F.3d 183 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Helton v. AT&T, Inc.*,
   709 F.3d 343 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Home Bldg. & Loan Ass'n v. Blaisdell*,
   290 U.S. 398 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 58

*Horwitz-Matthews, Inc. v. City of Chicago*,
   78 F.3d 1248 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Local Division 589, Amalgamated Transit Union v. Massachusetts*,
   666 F.2d 618 (1st Cir. 1981), *cert. denied*,
   457 U.S. 1117 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Maryland State Teachers Ass'n v. Hughes*,
   594 F. Supp. 1353, 1368 (D. Md. 1984), *aff'd*,
   No. 84-2213 (4th Cir. Dec. 5, 1985), *cert. denied*,
   475 U.S. 1140 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Meson v. GATX Technology Services Corp.*,
507 F.3d 803 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Sal Tinnerello & Sons, Inc. v. Town of Stonington*,
141 F.3d 46 (1st Cir.), *cert. denied*,
525 U.S. 923 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Singer v. City of Topeka*,
607 P.2d 467 (Kan. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*TM Park Ave. Assocs. v. Pataki*,
214 F.3d 344 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*United States Trust Co. v. New Jersey*,
431 U.S. 1, 21 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES

U.S. Const. art. I, § 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Balt. City Code, art. 22, § 30 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Balt. City Code, art. 22, § 33 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Balt. City Code, art. 22, § 36 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Balt. City Code, art. 22, § 36A (2009) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 45

Balt. City Code art. 22, § 36A (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## TREATISES AND OTHER AUTHORITIES

9C *Federal Practice & Procedure* § 2588 (3d ed. 2008) . . . . . . . . . . . . . . . . . . 31

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this is an appeal from a civil action that arises under the United States Constitution.  Doc. 5.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because appellant noted a timely appeal (Doc. 193) from a final decision that adjudicated all of the claims in the case.  Doc. 191.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Did the district court err in holding that Baltimore City Ordinance 10-306 substantially impaired vested contractual rights to post-retirement benefit-increases under the so-called "variable benefit"?

2.      Did the district court err in holding that Ordinance 10-306 was not reasonable and necessary to serve an important public purpose solely because it replaced the variable benefit with a tiered COLA under which retirees and beneficiaries receive different annual COLAs depending on their age?

3.      Did the district court err in identifying any impairment of the obligations of contract given plaintiffs' contention that they retain state-law breach of contract claims?

## STATEMENT OF THE CASE

This case involves a challenge to Baltimore City Ordinance 10-306, which altered the terms of a pension plan for police officers and firefighters and their beneficiaries.  For purposes of this appeal, the only issue is the ordinance's replacement of the variable benefit, in which annual benefit-increases (if any) varied depending on whether the plan had substantial investment gains in a given year, with a tiered COLA, under which the annual rate of benefit-increases (if any) depends on a member's age.

The plaintiffs are active and retired police officers and firefighters and the unions that represent them.  Two of the plaintiffs are proceeding as representatives of a class of retirees and their beneficiaries.

The defendant is the Mayor and City Council of Baltimore, the municipal corporation that is composed of the inhabitants of Baltimore City, Maryland. Baltimore City Charter, art. I, § 1.

Plaintiffs commenced this case on June 3, 2010 (Doc. 1), before Ordinance 10-306 was enacted.  Plaintiffs amended their complaint on September 20, 2010 (Doc. 5), after the City Council had passed the ordinance, and the Mayor had signed it into law.

The amended complaint contained nine counts.  Count I alleged that the ordinance impaired the obligations of contract in violation of the Contracts Clause of the federal Constitution.  Count II alleged that the City had taken plaintiffs' property without just compensation in violation of the Takings Clause of the Fifth Amendment.  Count III alleged that by enacting the ordinance the City had breached a statutory contract.  Counts IV through IX alleged miscellaneous state-law claims against the City, the pension plan's Board of Trustees, and the City's Director of Finance.  Doc. 5.

The court later allowed the local fire officers' union to intervene as a party-plaintiff with respect to Counts I through III and Count IX.

By order dated December 30, 2010, the district court dismissed all of the claims against the City's Director of Finance, dismissed some of the claims against the Board of Trustees, and severed all of the remaining claims against the Board of Trustees.  Doc. 39.  The decision effectively limited the issues in the case to the federal constitutional claims against the City (Counts I and II) and the claim that the City had breached a statutory contract (Count III).

Thereafter, the court structured the proceedings to address a series of questions concerning the Contracts Clause claim in Count I.  First, the court addressed whether the ordinance applied retroactively (and thus potentially

3

impaired the obligations of contract).  Doc. 68.  Second, the court addressed

whether any impairment was substantial.  Doc. 115.  Finally, the court addressed

whether any impairment, if substantial, was nonetheless permissible because it

was reasonable and necessary to further an important public purpose.  Doc. 167.

On March 16, 2011, the court held that the Baltimore City Code created a

contract between the City and the members of the pension plan.  Doc. 68.  In

addition, the court held that the ordinance implicated federal constitutional

concerns only insofar as it replaced the variable benefit with a tiered COLA.  *Id.*

The balance of the ordinance, the court held, raised no federal constitutional

concerns.  *Id.*

After hearing testimony and other evidence, the court issued a second

decision on September 6, 2011.  In that decision, the court held that the City

substantially impaired the obligations of contract by replacing the variable benefit

with the tiered COLA.  Doc. 115.

On the same day, the court certified a class of approximately 6,012 retirees

and beneficiaries who were actually receiving benefits under the plan as of the

ordinance's effective date, June 30, 2010.  Doc. 116.

After hearing additional testimony and additional evidence, the court issued

a third decision on September 20, 2012.  Doc. 167.  In that decision, the court held

4

that Ordinance 10-306 served the important public purposes of ensuring the City's financial integrity and increasing the actuarial soundness and sustainability of the pension system. Nonetheless, adopting a position that plaintiffs themselves had never advanced, the court held that the legislative changes were more drastic than necessary because, it said, the tiered COLA had a disproportionate impact on younger retirees and beneficiaries. *Id.* Consequently, the court held that the ordinance violated the Contracts Clause. *Id.*

By order dated November 30, 2012, the court dismissed the remaining federal claim, under the Takings Clause, reasoning that it had become moot. Doc. 186. On December 21, 2012, the court exercised its discretion under 28 U.S.C. § 1367 to dismiss the remaining state-law claims, including the claims that it had previously severed. Doc. 189.

The court embodied its rulings in a judgment, which was entered on the docket on December 28, 2012. Doc. 191. The City noted its timely appeal on that same day. Doc. 193. On January 25, 2013, plaintiffs cross-appealed. Doc. 200.

## STATEMENT OF FACTS[1]

### A.    The City's Budget and Pension Crises

In the spring of 2010, as the City prepared its budget for FY 2011, it faced

its third consecutive year of declining revenues and multi-million dollar deficits.

DX2(15)-J, ¶¶ 3-5; *see also* Tr. 2/2/12 at 5-18.

The City, which is required to balance its budget (Tr. 2/2/12 at 7), had

closed a $68.5 million deficit two years earlier, at the beginning of FY 2009, by

imposing significant cuts.  DX2-M(15), ¶ 6; *see* Tr. 2/2/12 at 6.  Nonetheless,

because of the severe decline in tax revenues that resulted from the Great

Recession in 2008 and 2009 (DX2-M(15), ¶ 4), the City had confronted a new,

$120 million deficit going into FY 2010 (DX2-M(15), ¶ 6; Tr. 2/2/12 at 7), which

began on July 1, 2009.  *See* Tr. 2/2/12 at 6-7.

Although the City addressed that FY 2010 deficit by adopting additional

cuts to core services (DX2-M(15) ¶ 7; *see* Tr. 2/2/12 at 8-9), unforeseen reductions

---

[1]    Although the district court conducted bench trials on the substantiality of any impairment and the reasonableness and necessity of the City's actions, there was little dispute about the material facts.  Plaintiffs conceded as much before the second trial, when they told the court that "there are actually very few disagreements about [the] facts," but only "disagreements about how those facts should be interpreted."  Tr. 1/30/12 at 6.  In fact, because all parties believed that there were no genuine disputes of material fact, they requested the opportunity to move for summary judgment (Docs. 54-56), but the court did not permit them to do so.

in State aid and revenue shortfalls resulted in an additional, mid-year deficit of $60.2 million. DX2-M(15), ¶ 8; *see* Tr. 2/2/12 at 9-11. The City closed the mid-year deficit with more cuts, including unpaid furloughs. DX2-M(15) ¶ 8; *see* Tr. 2/2/12 at 12. But after record snowstorms (Tr. 2/2/12 at 12-14), the City was required to implement yet another round of cuts and to use $30 million of its emergency reserves. DX2-M(15), ¶¶ 9-11; *see* Tr. 2/2/12 at 12-13.

Against this backdrop, the City confronted a $121 million deficit for FY 2011, which would begin on July 1, 2010. DX2-M(15), ¶ 12; *see* Tr. 2/2/12 at 15. Furthermore, although the budget included $101 million for the annual contribution to the Fire and Police Employees Retirement System (the "system" or the "plan"),[2] the $121 million deficit did not include an additional $64 million contribution that the City would be required to make if it retained the variable benefit and followed the Board of Trustees' recommendation to reduce the investment-return assumption on certain assets. DX2-M(15), ¶ 13; *see* Tr. 2/2/12 at 24-26; PX59-J. The Mayor testified that if the variable benefit were retained, it would be "irresponsible" not to follow the Trustees' recommendation. Tr. 2/2/12 at 25.

---

[2]    *See* DX2-M(3) at 2, 3; DX2-M(4) at 1; DX2-M(14) at 5.

To address its FY 2011 deficit, the City made numerous additional cuts in its proposed budget and raised $50 million through a package of new taxes. Tr. 2/2/12 at 15-16. Even the plaintiffs agreed, however, that the City could not raise enough new taxes or make enough additional cuts in core services to find the additional $64 million that it would need if it did not resolve the problem of the variable benefit. DX3-M at 76-77; Tr. 1/31/12 at 31-32; Tr. 2/2/12 at 48; *see* Tr. 2/3/12 at 192-98.

Furthermore, even without the additional $64 million annual cost that was associated with the variable benefit, it had become apparent that the City could not afford the increasing cost of the F&P system and still maintain essential services. *See* DX2-M(14) at 5. Because of factors that include improved mortality rates, prior benefit enhancements, and severe market losses in 2001-02 and in 2008-09, the system's funded ratio had fallen from over 102% in 2000 (*id.* at 20-21), to 74.2% in FY 2008, and to 58.2% at the end of FY 2009 on June 30, 2009. *Id.* at 21. As a result, the City's required contribution to the system had almost doubled, from $48.3 million in FY 2005 to $81.9 million in FY 2010; and it would double again, to $166 million, in FY 2011 if the City retained the variable benefit and adopted the assumptions that the Board of Trustees had recommended. *Id.* at 5.

8

The variable benefit itself had been a subject of concern for several years because it was funded from the investment gains that the system needed to pay the basic retirement benefit (*see* Tr. 3/23/11 at 103-07; Tr. 2/1/12 at 123-26) and to defray investment losses in bad years.  Tr. 2/1/12 at 123-26.  As early as 2002, the system's actuary had recommended a change in the variable benefit (PX6-M; PX7-M; Tr. 1/31/12 at 118; Tr. 2/2/12 at 192), but the City Council could not agree on how to proceed (Tr. 3/21/11 at 99; Tr. 1/31/12 at 118-19; Tr. 2/2/12 at 19-20; Tr. 2/2/12 at 192-95), in part because of union opposition to a change.  Tr. 3/22/11 at 106; Tr. 3/23/11 at 100; *see* Tr. 2/2/12 at 194.

On June 7, 2010, several councilmembers introduced the bill that became Ordinance 10-306.  *See* DX2-M(9).  Among other things, the bill replaced the variable benefit with a tiered COLA, under which retirees and beneficiaries who are 65 or older generally receive a 2.0% annual increase, retirees and beneficiaries who are 55 or older generally receive a 1.0% annual increase (until they turn 65), and retirees and beneficiaries who were under 55 generally receive no increase (until they turn 55).  *Id.*[3]

---

[3]     The ordinance continued a preexisting requirement that members be retired for two years before they receive any post-retirement increase.  PX2-M at 239 (Balt. City Code art. 22, § 36A(a)(1) (2010)).  The ordinance made numerous changes to other benefits, none of which, the district court held, implicated any federal constitutional concerns.  Doc. 68.

9

After considering the recommendations of a citizen task force (DX2-M(13);

Tr. 2/2/12 at 20-22), the opinions of pension and budget experts (*see*, *e.g.*, DX2-

M(14, 16, 17, 19)), a counterproposal from the unions (DX2-M(18); *see* DX2-M at

4-10), and the testimony of citizens and experts during two days of hearings

(DX3-M; DX4-M), the City Council enacted Ordinance 10-306, and the Mayor

signed it into law.

**B.    The F&P System**

The City Council established the F&P system in 1962 with the passage of

Ordinance 62-1285 (1962).  Although the original legislation created a basic

retirement benefit, it made no provision for any sort of post-retirement increase in

benefits.  *See* Tr. 3/22/11 at 96-98; Tr. 1/31/12 at 103.  Consequently, retirees

could receive an increase only if they successfully petitioned the City Council.  Tr.

3/22/11 at 97-98; Tr. 1/31/12 at 102.

The 1962 legislation established a four-fund structure that allowed the

system to monitor and account for different categories of assets.  Two of the funds

contained the assets of active members, while the other two contained retiree

assets.  PX1-M at 227-31 (Balt. City Code, art. 22, § 36(a)-(e) (2009)).

The 1962 legislation also established investment-return assumptions, *id*. at

159 (§ 30(9)), which the system's actuary used to calculate the City's annual

10

required contribution. *Id.* at 187-88 (§ 33(m)-(p)). For many years before the

enactment of Ordinance 10-306, the assumption had been 8.25% for active

members' assets and 6.8% for retiree assets. *Id*. at 159 (§ 30(9)).

### C.    The Variable Benefit

In 1983 the City Council established a post-retirement benefit-increase,

which it termed the "variable benefit." *See* Tr. 3/22/11 at 97; Tr. 1/30/12 at 106.

The benefit was "variable" in that it did not guaranty a fixed COLA, but instead

provided for benefit-increases that varied depending on the annual investment

return (if any) on the system's assets. PX1-M at 237-39 (Balt. City Code, art. 22, §

36A(b)-(c) (2009)).

Under the variable benefit regime, a benefit-increase would be triggered on

June 30th of a given year if, during the prior fiscal year, the earnings on the

system's funds exceeded 7.5%. PX1-M at 238-39 (Balt. City Code, art. 22, §

36A(c) (2009)). In that event, all of the investment returns on the retirees' assets

between 7.5% and 10%, and half of the returns on the retirees' assets in excess of

10%, would move from the system's four primary funds into two special funds,

created by the legislation, to pay for a benefit-increase to retirees. *Id.* at 239-40 (§

36A(c)-(d)). Because the City did not guaranty the variable benefit, the legislation

envisioned the purchase of safe, fixed-income instruments that were designed to

11

pay the increase for the expected life of each retiree. *Id.* at 240 (§ 36A(e)). Those assets were held in two new funds that related solely to the variable benefit. *Id.* at 239-40 (§ 36A(d)).

To illustrate, in FY 2005, the system's assets earned a return of 11.59%, or $175 million. PX37-M at 24. Of that $175 million, approximately $50 million represented (1) all of the earnings between 7.5% and 10% and (2) half the earnings in excess of 10%. *Id.* Of that $50 million, approximately $37 million was attributable to returns on the retirees' assets (as opposed to the returns on active members' assets). *Id.* Accordingly, $37 million was transferred from the system's primary funds and into two funds that had been created for the purpose of funding the variable benefit. *Id.* Using an assumed rate of interest of 5.0%, the market rate for such products in 2005, the system purchased fixed-income instruments that provided each eligible retiree or beneficiary with a raise of 2.2%. *Id.*

During the 27 fiscal years after its establishment in 1983, the variable benefit provided retirees with a raise in 17, but no raise in the remaining 10. *See* DX2-M(8). While the variable benefit generated the equivalent of a 3.0% annual increase from its inception in 1984 through 2009, it returned only 2.18% between 1990 and 2009 and only 1.42% between 2000 and 2009. DX2-M(5).

### D.    The Variable Benefit's Negative Impact

Because of increasing market volatility during the 2000s, it became apparent that the variable benefit had a negative impact on the system's viability. Tr. 2/1/12 at 124; Tr. 3/23/11 at 51; *see also* Tr. 3/23/11 at 23. Simply put, the system was unable to offset the large investment losses in some years because many of the investment gains in good years were siphoned off to fund the variable benefit. Tr. 2/1/12 at 124-25; Tr. 3/23/11 at 51.

By 2002, the system's actuary had begun to raise concerns about the variable benefit and, in particular, its impact on the ability of the funds holding retiree assets to meet the assumed return of 6.8%. PX6-M. The actuary specifically recommended that the City either eliminate the variable benefit or reduce the statutory investment-return assumptions. *See id.*; Tr. 3/23/11 at 98-99. In January 2004, with the actuary's comments in mind, the system's executive director warned a benefits task force, which included union representatives, that "the current plan provisions for post[-]retirement increases are harmful to the system" and that "if the current provisions remain in place, there could be insufficient assets to provide the base retirement benefits." DX11-J.

13

Because the system depends in large part on investment returns to fund the basic benefits, a lower investment-return assumption means a higher annual contribution from the City. DX2(14)-M at 11. Consequently, throughout the 2000s, the City made – and the unions opposed – several efforts to replace the variable benefit with a COLA. Tr. 3/22/11 at 106; Tr. 3/23/11 at 100; *see* Tr. 2/2/12 at 194.

The combination of poor performance in FY 2008 and FY 2009 and the partial recovery in FY 2010 provides a perfect illustration of the flaws in the variable benefit system. Even though the market plummeted by 55% during FY 2008 and FY 2009, and even though the 30% gains in FY 2010 recouped only part of what had been lost, the variable benefit would have been triggered. *See* Tr. 2/1/12 at 124-25. Thus, the variable benefit would divert a substantial portion of the gains at a time when the system most needed to marshal them to recover from the staggering losses of the recent past. *Id.* The district court accurately described this result as "illogical." Doc. 167 at 10-11.

### E.    The System's Deteriorating Condition

In early 2008, even before the stock market crash that began later that year, the unions' actuary, Thomas Lowman, calculated that the system had an unfunded liability of about $800 million (Tr. 1/30/12 at 110-11), which would cause the

City's annual amortization costs to quadruple, from $20 million per year to $80 million per year. *Id.* at 112.[4]

In early 2009, after the S&P 500 had fallen by 55% (Tr. 2/1/12 at 121-22), Mr. Lowman told the Board of Trustees that the unfunded liability had increased to $1.2 billion. Tr. 1/30/12 at 117-18. He also told the Board that the City's annual contribution would increase to $160 million or $170 million (*id.* at 118), that the system was less than 50% funded (*id.*), and that the pension plan was in trouble. *Id.* In an email to the head of the police union at about the same time, Mr. Lowman said that the system did not have enough money to cover the liabilities to the retirees and had nothing for the active employees. Tr. 1/31/12 at 15-16; DX89-J.

## F.    **The Greater Baltimore Committee**

In the spring of 2009, the City Council's Committee on Taxation, Finance & Economic Development considered a bill that addressed various aspects of the F&P system, including replacing the variable benefit with a 1.5% COLA with the possibility of a bonus in years in which investment performance exceeded 8.0%. *See* DX88-J; Tr. 2/2/12 at 192-94. The unions opposed the bill. *Id.* at 194.

---

[4]      The cost of amortizing unfunded liabilities (or paying them off over time) represents only a portion of the City's annual required contribution to the system: the City must also contribute millions to fund the basic benefits, which is known as the "normal cost." *See, e.g.*, PX37-M at 3.

According to Baltimore's Mayor (who was its City Council President in 2009), "While there was agreement that . . . the variable benefit was unsustainable, there was no agreement on how to fix it." Tr. 2/2/12 at 20. Consequently, she and the committee chairman requested help from the Greater Baltimore Committee or "GBC" (*id.* at 20-21), an organization of business and civic leaders that focuses on the business climate and quality of life in the Greater Baltimore region. http://www.gbc.org/page/about-us/ (last viewed April 18, 2013). They did so because they wanted recommendations from a disinterested party with an understanding of the City's economics. Tr. 2/2/12 at 20-21.

Over several months, the GBC assembled a committee of actuaries, accountants, business people, and civic leaders (DX2(13)-M, at 37-38), who studied the system's funding issues and solicited input from various stakeholders in the F&P system. In early 2010, the task force issued its recommendations, which included eliminating the variable benefit in favor of an annual COLA. *Id.* at 21-31.[5]

---

[5]      The task force recommended a COLA that would not exceed 3.0% (*id.* at 23), but the plaintiffs admitted to the City Council that the City could not afford to pay 3.0%. DX3-M at 65; Tr. 1/31/12 at 29. The task force made numerous other recommendations (DX2(13)-M at 21-31), many of which the ordinance adopted in whole or in part. The district court saw no federal constitutional issue in those other aspects of the legislation. Doc. 68.

### G.     The Retention of PFM and Aon

Meanwhile, the City retained Public Finance Management Inc. ("PFM"), and Aon Corporation ("Aon"), recognized experts in public finance and pensions, to review the impact of the GBC recommendations and assess what modifications, if any, were necessary to ensure the system's long-term affordability and sustainability. DX2-M(14) at 5; *see also* DX2-M(15), (17).

To that end, PFM reviewed the City's revenues and expenditures on both a historical and projected basis. Based on that review, PFM concluded that the City had little ability to increase revenues by increasing taxes, because its "tax effort," *i.e.*, the "measure of how much a government is drawing on its local tax base," already was, by far, the highest in the state. *Id.* at 6. PFM also concluded that the City had little room to make additional cuts in expenditures, particularly because the City had little control over the growth of several cost key centers (including contributions to employee pension systems and retiree medical costs). In addition, PFM observed that the additional $64 million that was required to keep the variable benefit in place was greater than the combined budgets of the Sheriff's Office, the Department of Parks and Recreation, and the City's library system. *Id.*

To determine what contribution level the City could sustain, PFM, with actuarial support from Aon, developed a series of multi-year budget projections under different pension scenarios.  Those projections demonstrated that:

- if the City did nothing, the additional annual cost of the variable benefit would grow from $64 million in FY 2011 to a cumulative total of $455.2 million in five years and $1.3 billion in 10 years; but

- if the City adopted the changes that were eventually contained in Ordinance 10-306, including the removal of the variable benefit, the budget would remain in balance for FY 2012 and FY 2013, after which a new deficit would develop.

*Id.* at 6-7, 24, 49; DX2-M(17).

## H.    <u>Bill 10-519</u>

Shortly after the release of the GBC report, three council members introduced a bill that contained many of the GBC's recommendations.  *See* Tr. 2/2/12 at 195.  A few weeks later, on June 7, 2010, several council members introduced Bill 10-519, which largely tracked the GBC's recommendations as well.  *Id.* at 196.  While both bills sought to replace the variable benefit with a COLA, Bill 10-519 proposed the tiered COLA, under which the amount of the annual benefit-increase would depend on a member's age.  *Id.*

18

At trial, the Mayor explained that, although the council had wanted to implement an across-the-board, 2.0% COLA for all retirees and beneficiaries, the City simply could not afford to pay a 2.0% COLA to everyone. *Id.* at 48; *id.* at 110. Consequently, the drafters set out to provide the greatest benefit for the retirees and beneficiaries who were likely to need it the most – the large number of retirees and beneficiaries who were 65 or older (PX96-J; Tr. 2/2/12 at 201-07) and who were likely to depend principally on their pension for their income. Tr. 2/2/12 at 48-49; *id.* at 110; *id.* at 168. As Mr. Lewandowski, a class representative, testified: "I am 72 years old. I mean I can't go back out, you know, out to work." Tr. 3/22/11 at 90.

On the other hand, the drafters recognized that most of the younger retirees, including those who retired on disability because they were unable to perform the physical tasks that a police officer or firefighter must perform,[6] could and frequently did work in second jobs or second careers after retirement. *Id.* at 48-49; *id.* at 110. Largely for that reason, the legislation generally provided them with a

---

[6]    "Disability" under the F&P system is not the same as "disability" under the Social Security system. Tr. 2/2/12 at 42; *id.* at 188-90. In the F&P system, members may become disabled from serving as police officers or firefighters if, for example, they suffer injuries that prevent them from apprehending fleeing suspects, climbing ladders, or performing some of the other physical requirements of their jobs. *Id.* at 187-88. Such persons, however, may remain fully able to perform numerous other jobs for which they are qualified by experience and training. *Id.* at 42.

19

smaller COLA until they reached 65 and with no COLA until they reached 55. *Id.*
at 48-49; *id.* at 110.

The idea of a tiered COLA had originated with one of the union
representatives on the system's Board of Trustees. *Id.* at 196-98; *see* DX51-J. The
representative had proposed employing different COLAs depending on whether an
employee had retired before or after 1996, when the "generous"[7] Deferred
Retirement Option Plan or "DROP" took effect. Tr. 2/2/12 at 197-98.

DROP provides that if members opt to remain with the police or fire
departments after they become eligible to retire, they not only continue to receive
their regular salaries, but also receive what would have been their retirement
benefits. Tr. 1/31/12 at 107-10. Those would-be benefits go into a special,
interest-bearing "DROP account," which members can withdraw in a lump sum
when they ultimately retire. *Id*. at 108. Since the adoption of DROP, many
younger retirees have supplemented their retirement income by amassing $100,000
or more in their DROP accounts. Tr. 1/31/12 at 110; *see* Tr. 2/2/12 at 111-12.
Indeed, one of the named plaintiffs, who was 58 years old in 2012, received
$221,364.64 from DROP. DX93-J; Tr. 2/2/12 at 185-86. In creating a tiered
COLA that gave the highest benefit to the oldest members, the City Council

---

[7]    Doc. 167 at 9 n.13. The description is the GBC's, but the district
court incorporated it into its opinion.

20

recognized that many of the older retirees (and their widows) had not benefitted from DROP.  Tr. 2/2/12 at 111-12.

Aside from replacing the variable benefit with the tiered COLA, Bill 10-519 guaranteed the payment of past and future benefit-increases (DX2-M(12) at 14), which the City had not previously done.  In addition, at the unions' request (Tr. 3/22/11 at 109), Bill 10-519 created a new "minimum benefit" (DX2-M(12) at 12-13; Tr. 2/2/12 at 111), which guaranteed an annual payment of $16,000 to the elderly widows of pre-DROP retirees.  DX2-M(12) at 12-13.  Mr. Lewandowski, a class representative, called the minimum benefit a "Godsend."  Tr. 3/22/11 at 109.[8]

## I.    The Hearing

On June 10, 2010, the City Council committee conducted a public hearing on Bill 10-519.  DX3-M.  At the hearing, the committee heard testimony from the City's experts, the system's actuary, the unions' actuary (Mr. Lowman), the plaintiffs' attorney, and several of the named plaintiffs.  *Id.*[9]

---

[8]    Because the bill replaced the variable benefit with the COLA, it became unnecessary to reduce the investment-return assumption on retiree assets to 5.0%.  The bill did, however, reduce the overall investment-return assumption from 8.25% to a more conservative 8.0%.  *Id.* at 3-4.

[9]    The City's experts reiterated their testimony at trial.  Tr. 2/1/12 at 102-28; Tr. 2/2/12 at 151-80; Tr. 2/2/12 at 224-38; Tr. 2/3/12 at 1-76; Tr. 2/3/12 at 86-189.

21

Mr. Lowman's testimony was particularly significant because of the admissions he made.  Mr. Lowman agreed with the system's actuary that if the City did not abolish the variable benefit, it needed to use the lower, 5.0% assumption for post-retirement assets.  DX3-M at 63; Tr. 1/31/12 at 31.  Consequently, he agreed with the system's actuary and the City's actuarial expert that if the City did nothing – *i.e.*, if it retained the variable benefit – it would cost the City an additional $64 million per year.  *See* DX3-M at 63; Tr. 1/31/12 at 29.  He also agreed that "the trend line" – *i.e.*, the increases in the City's annual contributions – "has to come down."  *See* DX3-M at 67; Tr. 1/31/12 at 30.

Mr. Lowman specifically told the Committee that "the true cost" of the benefits if the City did nothing was $165 million – the $101 million that the City had budgeted plus the additional $64 million cost that resulted from lowering the investment-return assumption.  *See* DX3-M at 76-77; Tr. 1/31/12 at 29.  In the next sentence, Mr. Lowman added: "We know you can't afford that."  DX3-M at 77; Tr. 1/31/12 at 31.  At trial, Mr. Lowman admitted that, by "we," he meant his clients, the unions.  Tr. 1/31/12 at 31.

## J.    The Unions' Counterproposal

On June 21, 2010, a council member proposed amendments, which, she said, had been "drafted and vetted" by the unions.  DX4-M at 4.  The amendments would have replaced the variable benefit with a 2.0%, across-the-board COLA.

22

DX4-M at 7; DX2-M(18) at 7.  In addition, in an effort to reduce the City's

projected contributions, the unions suggested extending the period for amortizing

unfunded liabilities from 20 years to 30.  DX3-M at 80; *id.* at 85-86; Tr. 1/31/12 at

33-34; DX2-M(18) at 7; *see* DX2-M(18).  In effect, a longer amortization period

would make the system more affordable by deferring payments (Tr. 2/2/12 at 167)

and thus reducing the City's annual contributions (*see* DX3-M at 85-86); at the

same time, however, it would extend the period of time in which the system

remained underfunded.  *See* DX2-M(18).[10]

The City's experts criticized the unions' counterproposal (DX2(19)-M),

saying that the movement to 30-year amortization was "directionally

inappropriate" and "a step away from more responsible funding practice."  *Id.*; *see*

*also* Tr. 2/2/12 at 162-64.  One of the experts, from PFM, observed that

accounting standards were expected to change so that governments would have to

amortize unfunded pension liabilities over the expected service life of their

employees, which, in the case of public safety employees, would be less than 20

years and certainly far less than 30.  Tr. 2/2/12 at 162-64.  A second expert, an

---

[10]    Aside from the extension of the amortization period, the unions'
proposal rejected the provision that would reduce the investment-return
assumption on active employee assets from the previous 8.25% to a more
mainstream 8.0%.  Tr. 2/2/12 at 153-55.  As previously stated, the use of the more
optimistic assumption is a means of dictating a lower annual contribution.

actuary, calculated that under the unions' counterproposal the funded level of the plan would increase from 59.7% to only 65.8% over 10 years. DX91-J. By contrast, under Bill 10-519, the funded level would increase to 75.7% over 10 years. *Id.*

The unions' actuary, Mr. Lowman, told the City Council that he was not "thrilled" with the prospect of moving from 20- to 30-year amortization. *See* DX3-M at 80; Tr. 1/31/12 at 34. Moreover, he told the Council, he was "sure" that accounting standards would change within a few years, making the proposed 30-year amortization period impermissible. *See* DX3-M at 80; Tr. 1/31/12 at 35. In fact, Mr. Lowman and his clients had previously opposed 30-year amortization (Tr. 1/31/12 at 39) and, as recently as 2009, had proposed that the City be penalized if it adopted 30-year amortization. *Id.* at 38; DX26-J. Most notably, Mr. Lowman agreed that if the City's calculations were correct, the unions' proposal would amount to "kicking the can down the road"– *i.e.*, delaying an attempt to rectify the plan's underfunded status. Tr. 1/31/12 at 42-43. Ironically, in their complaint in this lawsuit, which they had filed a week earlier, plaintiffs complained at length about underfunding. Doc. 1, ¶¶ 235-37.

24

### K.    Enactment

On June 21, 2010, the City Council passed Bill 10-519.  The following day, the Mayor signed it into law as Ordinance 10-306.  DX2-M(1) at 2.

The Mayor testified that she signed the legislation because, without it, the City was on what everyone agreed was "an unsustainable path."  *Id.* at 29. Everyone, the Mayor said, agreed that the City could not afford the pension system without a change to the variable benefit.  *See id.*; *id.* at 48.  As the Mayor put it:

> [E]verybody agreed the variable benefit wasn't going to work, it wasn't affordable, it wasn't sustainable.  FOP [the police union] agreed, the fire union agreed.  The previous administration agreed. My administration agreed.

*Id.* at 48.

The new legislation, by contrast, was a means of making the pension system both sustainable and affordable.  *Id.* at 30.  In the Mayor's words, the members of the F&P system "deserve[d] a dignified pension," but also "deserve[d] more than the false promise of a pension that was unsustainable and unaffordable."  *Id.* at 32.

## SUMMARY OF THE ARGUMENT

This Court should reverse for three reasons.  First, the district court erred in holding that the ordinance substantially impaired any contractual rights, because plaintiffs had no evidence that the tiered COLA would generate materially different results from the variable benefit and because the court misapplied the

25

factors relevant to substantial impairment. Second, the court erroneously substituted its judgment for that of the City's elected representatives about the means of implementing a permissible impairment once it had concluded, correctly, that the City's actions were necessary to serve important public purposes. Third, the case involves no federal issue at all given plaintiffs' contention that they retain state-law remedies for the City's alleged breach.

In their proof of substantial impairment, plaintiffs relied exclusively on an actuary, who offered his "estimate" or "assumption" that the variable benefit would generate a 3.0% return. The actuary, however, did not opine, to a reasonable degree of probability, about the likely future return. Instead, he merely extrapolated his "estimate" from past performance. In fact, however, while the variable benefit had generated a 3.0% return since 1984, it returned only 2.18% since 1990 and only 1.42% since 2000. Because the ordinance guarantees that most retirees and beneficiaries will a receive a 2.0% COLA every year henceforth, the court erred in holding that the ordinance substantially impaired any contractual rights.

The court compounded its error by misapplying the factors in *City of Charleston v. Public Serv. Comm'n*, 57 F.3d 385, 390 (4th Cir.), *cert. denied*, 516 U.S. 974 (1995). Although *City of Charleston* holds that substantial impairment

turns largely on the parties' expectations about whether the government could modify contractual rights, the court discounted or ignored the factors pertaining directly to expectations, both of which favored the City. The court went on to say that the impairment was substantial because the City had abolished the variable benefit, but it ignored the significant extent to which the tiered COLA had replaced the variable benefit and thus merely modified the system of post-retirement increases. In addition, the court erroneously called the variable benefit the "primary consideration" or "central undertaking" of the contract even though plaintiffs themselves had correctly described it as a mere "enhancement" to the basic benefit.

The district court itself recognized that "it is not possible to determine, with reasonable certainty, whether in the short or long term any given beneficiary (or all beneficiaries collectively) will receive more under the Variable Benefit system than the Ordinance COLA system." Doc. 115 at 36. Accordingly, the court erred in ruling in plaintiffs' favor on the issue of substantial impairment.

Given the overwhelming evidence of the City's budget crises, the deteriorating condition of the pension system, and the harm that the unaffordable variable benefit caused to the system, the district court correctly concluded that the ordinance was necessary and that it served the important public purposes of

27

ensuring the City's financial integrity and increasing the system's actuarial soundness.  Thus, the court correctly concluded that the City was acting properly pursuant to its reserved police powers, that it was not motivated by considerations of political expediency, and that it was not impermissibly placing its contractual obligations on a par with other policy choices.

Nonetheless, adopting a ground that plaintiffs never advocated, the court invalidated the ordinance because, it said, the tiered COLA had a disproportionate impact on younger retirees.  In reaching that conclusion, the court erroneously substituted its judgment for that of the City's elected representatives about the appropriate means of implementing a permissible impairment.

While a court should scrutinize the impairment of public contracts to ensure that the government's own self-interest has not improperly motivated its actions, a court must nonetheless defer to reasonable legislative policy decisions once it has concluded, as the district court did here, that the government acted in good faith. As this Court has said: "Not only are [courts] ill-equipped even to consider the evidence that would be relevant to such conflicting policy alternatives; [they] have no objective standards against which to assess the merit of the multitude of alternatives." *Baltimore Teachers Union v. Mayor & City Council of Baltimore*, 6 F.3d 1012, 1022 (4th Cir. 1993), *cert. denied*, 510 U.S. 1141 (1994).

The City had a wealth of reasons to substitute the tiered COLA for the variable benefit.  In particular, after concluding that it could not afford a 2.0%, across-the-board COLA for everyone, the City sought to distribute its limited resources in a way that would maximize the benefits for those who needed them the most – the oldest and most vulnerable retirees and beneficiaries, who were unable to supplement their retirement income in a second career, had not had access to the lucrative DROP benefit, and had retired at a time when compensation (and thus the basic benefit) was lower than it is today.  The district court may have disagreed with the City's policy decision, but it had no right to substitute its own policy preferences for the reasoned decisions of the City's democratically-accountable officials.

Notably, the district court did not assert that the City had drastically impaired the right to post-retirement increases by underfunding the COLA.  To the contrary, the court held that the City could have implemented an across-the-board COLA at a rate less than 2.0%.  Accordingly, the sole difference between the City's approach and that of the district court is that the City attempted to allocate the benefits to those who were likely to need them the most while the court insisted that the City must divide them equally among all.  There is no basis in Contracts Clause jurisprudence for the district court's implicit premise that a public employer cannot make reasonable distinctions among pension beneficiaries.

Nor was it accurate for the district court to state that the ordinance has a disproportionate or discriminatory impact on younger retirees. The ordinance gives every retiree, regardless of age, the opportunity to advance through the tiers and to obtain an increased COLA. In fact, if a younger retiree lives for his or her full expected life, he or she will receive a 2.0% COLA for 13 to 17 years – and thus will receive an overall COLA at a blended rate between 1.0% and 2.0%, which the district court held to be constitutionally permissible. In effect, the tiered COLA results in the same return as the court's flat COLA, but backloads the benefits until the time when the retiree needs them most. In incorrectly stating that the tiered COLA has a discriminatory effect on younger retirees, the district court manipulated this data so as to ignore the substantial period of time in which the retirees are likely to live past 65 and receive a 2.0% COLA. Doc. 167 at 29.

In summary, it was undeniably necessary for the City to take action on the variable benefit; its actions unquestionably served important public purposes; it did not curtail the overall right to post-retirement increases to an extent that was greater than necessary; and it made reasonable, good-faith policy decisions about how to distribute the impact of its actions. In these circumstances, the district court erred in substituting its judgment about how best to distribute the impact.

Finally, because plaintiffs claim to have a state-law remedy for breach of contract, the district court erred in concluding that they have any Contracts Clause claim at all. *Crosby v. City of Gastonia*, 635 F.3d 634, 642 & n.7 (4th Cir.), *cert. denied,* ___ U.S. ___, 132 S. Ct. 112 (2011). For that additional reason, this Court should reverse.

## ARGUMENT

## I.    STANDARD OF REVIEW

Although the district court frequently characterized its conclusions as findings,[11] the City does not challenge findings of fact that would be reviewable only for clear error. *See Helton v. AT&T, Inc.*, 709 F.3d 343, 350 (4th Cir. 2013). Instead, the City challenges only the district court's application of the law to the facts and the resulting legal conclusions concerning the constitutionality of Ordinance 10-306. Those conclusions are subject to *de novo* review. *See, e.g.*, *Meson v. GATX Technology Services Corp.*, 507 F.3d 803, 806 (4th Cir. 2007); 9C *Federal Practice & Procedure* § 2588, at 459 (3d ed. 2008).

---

[11]     *See, e.g.*, Doc. 115 at 9-10 (describing interpretation of City Code as a "finding").

31

## II.    THE COURT ERRED IN HOLDING THAT ORDINANCE 10-306 VIOLATES THE CONTRACTS CLAUSE

### A.    The Applicable Legal Standards

The Contracts Clause of the federal Constitution states that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10.  Despite its "absolute terms," however, "the Supreme Court does not interpret the Clause absolutely to prohibit the impairment of either government or private contracts."  *Baltimore Teachers Union v. Mayor & City Council of Baltimore*, 6 F.3d 1012, 1014 (4th Cir. 1993), *cert. denied*, 510 U.S. 1141 (1994)*; see Fraternal Order of Police Lodge No. 89 v. Prince George's County*, 608 F.3d 183, 188 (4th Cir. 2010); *City of Charleston v. Public Serv. Comm'n*, 57 F.3d 385, 390 (4th Cir.), *cert. denied*, 516 U.S. 974 (1995).  "Instead, the Court has outlined a three-part test intended to balance the Contract Clause's protections against the state's reserved police powers."  *Prince George's County*, 608 F.3d at 188; *Baltimore Teachers*, 6 F.3d at 1015; *City of Charleston*, 57 F.3d at 390-91.

Under that test, a "court must determine: (1) whether there has been an impairment of the contract; (2) whether that impairment was substantial; and (3) if so, whether the impairment was nonetheless a legitimate exercise of the police power."  *Prince George's County*, 608 F.3d at 188; *Baltimore Teachers*, 6 F.3d at 1015; *City of Charleston*, 57 F.3d at 391.  The test "harmoniz[es] the command of the Clause with the 'necessarily reserved' sovereign power of the states to provide

32

for the welfare of their citizens." *Baltimore Teachers*, 6 F.3d at 1015 (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 21 (1977)); *see City of Charleston*, 57 F.3d at 390.

While the Supreme Court "has provided little specific guidance as to what constitutes a 'substantial' contract impairment" (*Baltimore Teachers*, 6 F.3d at 1017), it "is clear that not all impairments are substantial for Contract Clause purposes." *Id.* Instead, "[i]n determining whether an impairment is substantial and so not 'permitted under the Constitution,' of greatest concern appears to be the contracting parties' actual reliance on the abridged contractual term." *City of Charleston*, 57 F.3d at 392 (quoting *United States Trust*, 431 U.S. at 21); *see Baltimore Teachers*, 6 F.3d at 1017.

To evaluate how much the parties actually relied on a contractual term, and thus whether an alleged impairment was substantial, *City of Charleston* identified four factors for a court to balance:

- whether the contract indicates – either explicitly or implicitly – that the allegedly abridged term was "subject to impairment by the legislature," *City of Charleston,* 57 F.3d at 392-93 (citation omitted);

- whether the area at issue has been regulated in the past, *id.* at 393;

- whether a particular covenant has been abolished or "merely modified," *id.* (citation omitted); and

- whether the abridged right was the central undertaking or primary consideration of the parties. *Id.*

33

"In addition to assessing the parties' expectations and actual reliance on the abridged contractual term," *City of Charleston* also observed that under Supreme Court precedent "a court should determine whether the abridged right was 'replaced by an arguably comparable security provision.'" *Id.* at 394 (quoting *United States Trust*, 431 U.S. at 19). If the replacement is "arguably comparable," no substantial impairment has occurred. *See id.* at 394-95.

Even if a court finds a substantial impairment, "[t]his does not end the analysis." *Baltimore Teachers*, 6 F.3d at 1018. Instead, the court "must yet 'attempt to reconcile the strictures of the Contract Clause with the "essential attributes of sovereign power" necessarily reserved by the States to safeguard the welfare of their citizens.'" *Id.* (quoting *United States Trust*, 431 U.S. at 21, *which quoted Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 435 (1934)). In conducting that analysis, a court must resolve whether a government modification of its own financial obligations is "'reasonable and necessary to serve an important public purpose.'" *Id.* (quoting *United States Trust*, 431 U.S. at 25).

While the State's self-interest in altering its own contractual obligations means that a court should not give "'complete deference' to legislative assessments of the reasonableness and necessity for modifying public contracts," *Baltimore Teachers*, 6 F.3d at 1019, "at least some deference to legislative policy decisions

34

. . . must be accorded." *Id.; see also Buffalo Teachers Fed. v. Tobe*, 464 F.3d 362, 370-71 (2d Cir. 2006), *cert. denied*, 550 U.S. 918 (2007) (courts are not required to "reexamine all of the factors underlying the legislation at issue and to make a *de novo* determination whether another alternative would have constituted a better statutory solution to a given problem"); *Local Division 589, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618, 643 (1st Cir. 1981) (Breyer, J.), *cert. denied*, 457 U.S. 1117 (1982) ("Where economic or social legislation is at issue, some deference to the legislature's judgment is surely called for").  Thus, "[a]though the [Supreme] Court has never specified what it intends by the requirement of a more searching examination, it appears to mean by this only that the legislature's asserted justifications for the impairment shall not be given the complete deference that they would otherwise enjoy." *Baltimore Teachers*, 6 F.3d at 1019 n.10.

Moreover, the Contract Clause "does not require the courts – even where public contracts have been impaired – to sit as superlegislatures." *Baltimore Teachers*, 6 F.3d at 1021; *see also Buffalo Teachers*, 464 F.3d at 371 ("a high level of judicial scrutiny of the legislature's actions would harken a dangerous return to the days of *Lochner v. New York*, . . . in which courts would act as superlegislatures").  "Not only are [courts] ill-equipped even to consider the

35

evidence that would be relevant to such conflicting policy alternatives; [they] have no objective standards against which to assess the merit of the multitude of alternatives." *Baltimore Teachers*, 6 F.3d at 1022.

At bottom, a court's task is "to ensure through the 'necessity and reasonableness' inquiry that states neither 'consider impairing the obligations of [their] own contracts on a par with other policy alternatives' or 'impose a drastic impairment when an evident and more moderate course would serve its purposes equally well,' nor act unreasonably 'in light of the surrounding circumstances.'" Doc. 127 at 4 (quoting *Baltimore Teachers*, 6 F.3d at 1020, *which quoted United States Trust*, 431 U.S. at 30-31).

### B.    The Court Erred in Holding that the Ordinance Substantially Impaired the Obligations of Contract

**1.    <u>Plaintiffs' Failure of Proof</u>**.  Plaintiffs had the burden of proving that the City substantially impaired the obligations of contract by replacing the variable benefit with the tiered COLA.  *Catawba Indian Tribe v. City of Rock Hill*, 501 F.3d 368, 371 (4th Cir. 2007).  Because they failed to present any competent evidence concerning how future variable benefit increases would compare to future increases under the tiered COLA, the district court erred in concluding that the ordinance resulted in a substantial impairment.

36

In arguing that the ordinance substantially impaired their contractual rights, plaintiffs relied exclusively on the testimony of an actuary, Joseph Esuchanko. Mr. Esuchanko presented a series of charts, all of which assumed that the variable benefit would generate the equivalent of a 3.0% COLA.  Tr. 3/24/11 at 29-32; *id.* at 83-84, 96; PX16M-25M.  Mr. Esuchanko conceded, however, that his 3.0% "estimate" (Tr. 3/24/11 at 39) or "assumption" (*id.* at 37) was not an actuarial calculation, but was based simply on the average of the past 25 years of variable benefit increases.  *Id.* at 84.  Thus, Mr. Esuchanko did not base his conclusion on an analysis of the many variables that one would have to consider in attempting to forecast likely future increases in the variable benefit.  *See id.* at 37-38.[12]  In fact, Mr. Esuchanko said that because of the sheer number of relevant variables, it would be "virtually impossible" to perform that task – and, hence, that any projection would become less and less accurate as it extended farther into the future.  *Id.* at 89; *see also id.* at 37-38.

_____

[12]     Those variables include what the markets would generate for each component of the plan's portfolio in each future year; how much in excess earnings the plan would have in any given year; how much of those earnings would be allocated to the variable benefit based on the ratio of active to retired employees in any given year; when, in the future, employees would retire (and begin to receive the benefit); and how long future retirees and their beneficiaries would live (and thus continue to receive the benefit).  Tr. 3/23/11 at 112-18; Doc. 115 at 36 n.22.

In summary, Mr. Esuchanko did not offer an opinion, to a reasonable degree of probability, about likely future returns for the variable benefit, but rather an extrapolation from what had occurred in the past.  For that reason, his opinion was plainly fallacious.[13]

Furthermore, while the variable benefit had generated the equivalent of a 3.0% increase from 1984 through 2009, members would have earned 3.0% only if they had received benefits during that entire 25-year period.  If, by contrast, members had been receiving benefits only since 1990, they would have earned only a 2.18% increase.  DX5-M.  Moreover, if members had been receiving benefits only since 2000, they would have earned only a 1.42% increase (*id.*) – and would have received no increase at all in six of the ten years in that decade.  DX8-M.

In short, the 3.0% increase went only to the tiny fraction of members who had been receiving benefits since 1984, and they had received it only because of outsized gains in the first several years.  *See* DX8-M.[14]  For most members, on the

---

[13]    The opinion was fallacious not only because past performance is no guarantee of future results, but also because there is every reason to believe that future variable benefits would *not* equal the returns of the past.  *See* Tr. 3/23/11 at 115-21.

[14]    In 1984, the first year of the variable benefit, members received at least 10.66% increase, and some received more.  The members received another 10.39% increase in 1986 and an 8.67% increase in 1987.  In the following 22 years, the variable benefit never resulted in an annual increase as large as the increases in those first several years.  *See* DX8-M.

38

other hand, the 3.0% increase did not at all represent their experience. In fact, because the majority of the retirees and their beneficiaries (including both of their class representatives) are 65 or older (PX96-J; Tr. 3/22/11 at 90; Tr. 4/5/11 at 13, 18, 19), Ordinance 10-306 now guarantees that most of the class members will receive a 2.0% annual COLA that substantially exceeds the 1.42% variable benefit increase that they had received in the previous decade. DX5-M. In these circumstances, the ordinance could not have substantially impaired the obligations of contract.

In summary, because plaintiffs relied solely on Mr. Esuchanko's flawed assumption that the future "may" replicate the past, they gave the district court no basis to conclude that the replacement of the variable benefit with the tiered COLA resulted in a substantial impairment. As the court itself recognized, "It is not possible to determine, with reasonable certainty, whether in the short or long term any given beneficiary (or all beneficiaries collectively) will receive more under the Variable Benefit system than the Ordinance COLA system." Doc. 115 at 36. In view of that failure of proof, the district court had no basis to find a substantial impairment.

      **2.**    **City of Charleston.** In concluding that the ordinance substantially impaired the obligations of contract, the district court discussed but misapplied the four factors enumerated in *City of Charleston v. Public Serv.*

*Comm'n*, 57 F.3d 385 (4th Cir.), *cert. denied*, 516 U.S. 974 (1995). Therefore, the court erroneously concluded that the ordinance substantially impaired the obligations of contract.

On the first factor, concerning whether the plan was expressly or implicitly subject to legislative impairment, the court agreed that the City had the reserved legislative power to make amendments to the plan. Doc. 115 at 27; *see City of Frederick v. Quinn*, 35 Md. App. 626, 630-31 (1977). Thus, the court concluded that the variable benefit was implicitly subject to impairment. Doc. 115 at 27-28. The court, however, discounted the impact of its conclusion, stating that the plan did not expressly make the variable benefit subject to impairment. *Id.* at 29. Because this first factor would weigh in the City's favor if the benefit was *either* expressly *or* implicitly subject to impairment, the court erred in discounting it.

On the second factor, concerning whether the area at issue had been regulated in the past, the court correctly observed that "since its inception in 1962, the plan has been the subject of local legislation." Doc. 115 at 30; *see* Tr. 3/22/11 at 97, 99. On that basis, the court correctly concluded that "the Plaintiffs could not have had a realistic expectation that the City would not change the Plan after its original adoption [in 1962] or after its amendment [in 1983] to add the Variable Benefit feature." Doc. 115 at 30. The court, however, dismissed this factor, asserting, without explanation, that it was "not materially significant" in

40

determining whether the "elimination" of the variable benefit resulted in a substantial impairment. *Id.* Because this factor, too, weighed in the City's favor, and because the issue of substantial impairment depends largely on "the parties' expectations" (*City of Charleston*, 57 F.3d at 393), the court erred in disregarding its conclusion that the plaintiffs could not realistically have expected the plan not to change.

On the third factor, concerning whether a particular right has been abolished or has been "merely modified," the court simply asserted that "there is no doubt that there was an abolishment of the Variable Benefit feature." Doc. 115 at 31. The court, thus, gave no consideration to extent to which the tiered COLA had replaced the variable benefit. In other words, the court characterized the applicable right as the narrow right to the variable benefit, and not as the broader right to post-retirement benefit-increases. By framing the issue in a way that dictated its conclusion, the court erroneously failed to consider the extent to which the ordinance had "merely modified" the right to post-retirement increases by substituting the tiered COLA for the variable benefit. Its error allowed it to treat the third factor as one that favored the plaintiffs.[15]

---

[15]     Notably, on other occasions, the district court recognized that both the City (Doc. 167 at 11, 12), and the unions (*id.* at 14) envisioned that the COLA would "replace" the variable benefit.

On the fourth and final factor, concerning whether the abridged right was the "central undertaking" or "primary consideration," the court erroneously conflated the basic benefit, which the ordinance did not affect, with the means of computing post-retirement raises, which it did. For example, the court asserted that "[l]egislation causing a 'fundamental change' in a pension plan has been held to be a substantial impairment." Doc. 115 at 31 (quoting *City of Charleston*, 57 F.3d at 394, *which cited Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 246 (1978)). The Court, however, failed to note that in *Spannaus* the "'fundamental change'" involved the retroactive imposition of liability for *basic* pension benefits, not for post-retirement increases to the basic benefit. *See Spannaus*, 438 U.S. at 238-39.

Similarly, citing *Andrews v. Anne Arundel County*, 931 F. Supp. 1255 (D. Md. 1996), *aff'd*, 114 F.3d 1175 (4th Cir.), *cert. denied*, 522 U.S. 1015 (1997), the court asserted that "[t]he diminution of pension benefits is more likely than not an even more substantial impairment than a diminution of annual salary." Doc. 115 at 32. Again, however, the court failed to note that *Andrews* concerned a change to the *basic* benefit, not to the means of computing post-retirement *increases*.

42

The plaintiffs themselves had repeatedly recognized the peripheral nature of the variable benefit by describing it, accurately, as an "enhancement" to the basic benefit. Doc. 71 at 2, 3, 4, 10; Tr. 3/22/11 at 15, 28, 98. Given that description, the court erred in concluding that the variable benefit was somehow a central undertaking or primary consideration.[16]

The court also erred in its analysis of whether the benefits under Ordinance 10-306 are "arguably comparable" to the variable benefit. *City of Charleston*, 57 F.3d at 394. In concluding that they were not, the court acknowledged that the "Godsend" of a new minimum benefit (Tr. 3/22/11 at 109) actually increased the basic benefit for some members. *See* Doc. 115 at 35. The court also acknowledged that the ordinance guaranteed the payment of previously-awarded variable benefits – a guaranty that had been absent in the past. *Id.* at 37 n.23. Nonetheless, citing the tiered COLA, the court opined that two systems "would yield materially different results for all and certainly materially different treatment of those who were treated equivalently under the Variable Benefit system." *Id.* at 37.

_____

[16]    Because the City did not establish the variable benefit until 1983, the benefit did not even exist when Mr. Lewandowski, one of the class representatives, joined the police force in 1960. Tr. 3/22/11 at 96. Nor did the variable benefit exist in 1968 when the other representative, Mr. Williams, joined the fire department. Doc. 5 at 9. For those reasons, the variable benefit could not have been the "central undertaking" or "primary consideration" for Mr. Lewandowski, Mr. Williams, and others like them who joined the police or fire departments before 1983.

43

Yet since the court admittedly could not say that the "materially *different* results" would mean materially *worse* results (Doc. 115 at 37), its core concern appears to have been the "materially different treatment of those who were treated equivalently" before the enactment of Ordinance 10-306. *Id.* at 37. In a pension system, however, "'the reasonableness of legislative changes is to be measured by the advantage or disadvantage to the affected employees as a group or groups; validity of change is not dependent upon the effect upon each employee.'" *Davis v. Mayor and Aldermen of the City of Annapolis*, 98 Md. App. 707, 714 (1994) (quoting *Singer v. City of Topeka,* 607 P.2d 467, 475-76 (Kan. 1980)).

In the F&P system, where more than 6,000 people were receiving benefits as of the ordinance's effective date, the City cannot be expected to achieve perfect equity for each member. Thus, the relevant question cannot be whether a legislative change treats some members differently from others, but whether the change substantially impairs the obligations to the members as a whole. Given that the district court admittedly could not say whether "any given beneficiary (or all beneficiaries collectively) will receive more under the Variable Benefit system than the Ordinance COLA system" (Doc. 115 at 36), and indeed given that the majority of the beneficiaries now receive a 2.0% annual COLA that

44

substantially exceeds the 1.42% return in the last decade, the court erred in concluding that Ordinance 10-306 substantially impairs the obligations of contract.[17]

### C. The Court Erred in Holding that the Ordinance Was Not Reasonable and Necessary to Serve What It Found to Be an Important Public Purpose

In holding that Ordinance 10-306 violated the Contracts Clause, the district court accepted the City's ample proof of the budgetary and pension-funding crises that necessitated the legislative action. Thus, the court expressly held that the legislation served the important purposes of ensuring the City's financial integrity and increasing the plan's actuarial soundness. Doc. 167 at 20-23. In addition, the court specifically stated that "it was reasonable for the City to enact legislation to stabilize the Plan by impairing the Variable Benefit." *Id.* at 30. In fact, after the

---

[17] Setting aside the plaintiffs' failure of proof and the district court's misapplication of *City of Charleston*, the City disputes that the ordinance effected any impairment, let alone a substantial impairment, of a contractual right to future variable benefits. *Quinn*, 35 Md. App. at 630-31. Under former Art. 22, § 36A(e)(ii), of the Baltimore City Code (PX1-M at 241), "any [variable] benefit increase . . . is not and does not become an obligation of the City of Baltimore." Moreover, that section expressly excluded benefit increases from Art. 22, § 42, which establishes a contractual right in employment benefits. PX1-M at 241. Accordingly, the City was not contractually prohibited from prospectively modifying the variable benefit system. *But see Board of Trustees of the Empls. Ret. Sys. v. Mayor & City Council of Baltimore*, 317 Md. 72, 100 n.26 (1989), *cert. denied*, 493 U.S. 1093 (1990) (stating, in dicta, that beneficiaries had a contractual right to variable benefits).

court had heard all the evidence, even the plaintiffs agreed that "a change was needed." Tr. 2/3/12 at 198. Nonetheless, the district court invalidated the ordinance because it "treats Plan beneficiaries differently according to their age and thus impairs the contract rights of some far more severely than others." Doc. 167 at 30.

In holding the ordinance unconstitutional because of its different treatment of older and younger beneficiaries, the court placed its decision on a ground that plaintiffs neither advocated nor could have advocated: because the court had certified a class of *all* retirees and beneficiaries who, *regardless of age*, had been receiving the variable benefit as of the ordinance's effective date, the plaintiffs could not plausibly contend that the ordinance wrongfully discriminated in favor of some class members at the expense of others. Instead, plaintiffs had argued, among other things, that by allegedly underfunding the pension system, the City had manufactured a putative "crisis" (until the end of the case, they refused to concede that it was real), which the City impermissibly sought to exploit by altering their benefits. *See* Doc. 106; *see also* Docs. 100, 103, 104, and 108. Alternatively, plaintiffs argued that, notwithstanding Mr. Lowman's admission that the City could not afford the variable benefit (DX3-M at 77; Tr. 1/31/12 at 31), the City actually could have afforded the additional $64 million annual cost through some mixture of tax increases and unspecified spending cuts, or perhaps by

46

invading its budgetary reserves.  Tr. 1/31/12 at 131-65; 2/1/12 at 2-102.  The

district court implicitly rejected plaintiffs' arguments when it based its decision on

a ground that they never advanced and that the court, instead, devised on its own.[18]

In reaching its decision, the district court effectively held that the Contracts

Clause requires the City to continue to provide retirees with equal "inflation

protection."  *Id.* at 24; *see id.* at 32.  The court also held that, despite the

acknowledged danger of judges acting as superlegislatures and despite the courts'

admitted inability to evaluate "conflicting policy alternatives" (*Baltimore*

*Teachers*, 6 F.3d at 1021-22), a court may nonetheless disregard the policy

judgments of elected public officials about how to implement a permissible

impairment.  Indeed, the court held that a court may disregard those judgments

even after it has found that the officials were acting reasonably, pursuant to the

government's inherent powers to protect the health, safety, and welfare of its

---

[18]    It is difficult to square the certification of a class of all retirees and beneficiaries who were receiving variable benefits as of the ordinance's effective date with the court's conclusion that the ordinance discriminated in favor of the old at the expense the young.  *See, e.g., Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998) (class certification is inappropriate if there is adversity among subgroups).  In this regard, it is noteworthy that the two class representatives were both among the older class members who benefitted from the alleged discrimination by receiving a guaranteed 2.0% COLA.  *But see id.* at 338 (a class representative must possess the same interest and suffer the same injury as the class members).

citizens, and in furtherance of important public purposes.  Because the district court's conclusions are inconsistent with established Contracts Clause jurisprudence, this Court should reverse.

As an initial matter, the district court was unquestionably correct in concluding that the ordinance advanced important public purposes.  The court recognized that the post-retirement investment-return assumption was unrealistic given that "the Variable Benefit skimmed off most earnings above 7.5% in any good year."  Doc. 167 at 20.  The court also recognized, however, that if the assumption were lowered to a realistic rate, there would be "a dramatic and unaffordable increase of $64 million to the City's planned annual contribution."  *Id.*  By adopting the actuary's recommendation to replace the variable benefit with a COLA, the City could accomplish the dual purposes of enhancing the plan's actuarial soundness while making the plan affordable and sustainable.  It is beyond any serious dispute that ensuring a city's financial integrity is an important public purpose (Doc. 167 at 20 (citing *Baltimore Teachers*, 6 F.3d at 1019)), as is "[i]ncreasing 'the actuarial soundness of a pension system.'"  *Id.* (quoting *Maryland State Teachers Ass'n v. Hughes*, 594 F. Supp. 1353, 1368 (D. Md. 1984), *aff'd*, No. 84-2213 (4th Cir. Dec. 5, 1985), *cert. denied*, 475 U.S. 1140 (1986)).  Hence, the court correctly held that the ordinance "served an important public purpose."  *Id.*

48

Indeed, in view of the overwhelming evidence of the City's ongoing budget crises, the draconian steps that the City had already taken to address its past deficits from 2008 through 2010, the new, $121 million deficit that the City had to close by July 1, 2010, the additional $64 million that the City would need in order to fund what plaintiffs' actuary called the "true cost" of the plan without legislative modification (DX3-M at 76-77; Tr. 1/31/12 at 29), the additional cuts to core services that the City would have to implement if the City Council did not replace the variable benefit, the "illogic" of the variable benefit itself (Doc. 167 at 21) and the threat that it had begun to pose to the basic benefit (PX7-M), and the plaintiffs' candid concession that "a change was needed" (Tr. 2/3/12 at 198), the City undeniably acted to further an important public purpose.  Simply put, as in *Baltimore Teachers*, 6 F.3d at 1021, the City was approaching, or even at, the point where it had to begin cutting basic services and initiating the breakdown of government.

Nonetheless, while the district court concluded that it was reasonable and necessary for the City to alter the means of providing post-retirement increases and that it furthered an important public purpose to do so, it rejected the means that the City's elected officials devised to implement that purpose.  The court erred in applying its "more searching examination" not only to the "legislature's asserted justifications for the impairment," but also to policy judgments that the legislature

49

made in effectuating an impairment that, the court had found, it had a right to
make. *See Baltimore Teachers*, 6 F.3d at 1019 n.10 (the requirement of a "more
searching examination" appears to mean "only that the legislature's asserted
justifications for the impairment shall not be given the complete deference that
they otherwise would enjoy"); *accord Hughes*, 594 F. Supp. at 1371("while the
court must look carefully at the necessity for the modification to assure itself that
the State's self interest is not masking the facts, once the facts are brought to light
the court should not act as a super legislature and attempt to second guess which
legislative act would have better solved the perceived problem").

The court began by observing that "the impairment of public contracts 'must
be more scrupulously examined' than the impairment of private contracts, because
the State's self-interest is at stake."  Doc. 167 at 24-25 (quoting *Baltimore
Teachers*, 6 F.3d at 1019).  The court, however, failed to note that, in concluding
that the City had acted in furtherance of an important public purpose, it had
already rejected the proposition that the City was acting improperly to advance its
own self-interest.  *See Baltimore Teachers*, 6 F.3d at 1019 (quoting *Energy
Reserves Group, Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 412 (1983))
("[t]he requirement of a legitimate public purpose guarantees that the State is
exercising its police power, rather than providing a benefit to special interests").

50

The court, in other words, had effectively found that the City was not motivated by considerations of "political expediency" (*id.* at 1020 (quoting *Association of Surrogates and Supreme Court Reporters v. New York*, 940 F.2d 766, 773 (2d Cir. 1991)) and had not put variable benefit reform "on a par with other policy alternatives." *Id.* Accordingly, the court erred in undertaking a less deferential and "more scrupulous[]" examination of the means that the City employed to effectuate the important public policies that motivated the City's actions.

On other occasions, the court seemed to equate an impermissible "drastic" impairment with anything more than a minimal impairment. For example, citing the district court opinion in *Hughes*, the court remarked that the impairment in that case was "'minimal at worst.'" Doc. 167 at 27 (quoting *Hughes*, 594 F. Supp. at 1370).[19] The court added that "the total elimination of the Variable Benefit," which, the court now said, "provided an average of a 3% annual benefit increase for many members," is not a "minimal impairment." *Id.* at 28-29. The court erred not only because of its apparent endorsement of a premise that it had previously disavowed (concerning the rate of return for future variable benefits), but also

---

[19]    In fact, in *Hughes*, 594 F. Supp. at 1364, the court concluded that there was no impairment at all.

because it implied that an impairment is permissible only if it can be characterized as "minimal."  If the court were correct, then the Contracts Clause analysis would automatically end as soon as a court found a substantial impairment.[20]

The court's principal criticism was that, in adopting the tiered COLA, the City had "drastically impaired" the rights of the younger plan members when it could have "served its purposes equally well" through the "evident" and "more moderate" course of an identical COLA for all.  *Id.* at 27-28; *see Baltimore Teachers*, 6 F.3d at 1020.  The court, however, did not assert that the City had drastically impaired the right to post-retirement benefit-increases by providing insufficient funding for a COLA.  In fact, the court specifically found that, in furtherance of "the important public purpose of restoring actuarial soundness to the Plan, while 'tailor[ing] the plan as narrowly as possible to meet its unforeseen shortfalls'" (Doc. 167 at 31-32 (quoting *Baltimore Teachers*, 6 F.3d at 1021), the City could, constitutionally, have provided all members a flat, across-the-board

---

[20]    The court also observed that the alleged impairment exceeded the one-time, .95% salary reduction that this Court upheld in *Baltimore Teachers*. Doc. 167 at 28-29.  There is, however, no indication that *Baltimore Teachers* intended to define the outer limit of a permissible impairment.  In any event, in this case, as in *Baltimore Teachers*, 6 F.3d at 1020, any impairment was certainly "less drastic than at least one alternative" – the layoffs of over 300 active firefighters and police officers.  *See* DX2-M(14) at 47.  Of course, this case does not involve reductions in salary or even reductions in the basic retirement benefit, but rather changes in the method for computing future benefit-increases.

COLA of something less than 2.0%. *Id.* at 32; *see also id.* at 29 (referring to an "equally applied COLA of something less than 2%"). In these circumstances, the amount of any *overall* reduction in post-retirement benefit-increases was certainly "no greater than necessary to meet the anticipated shortfall." *Baltimore Teachers*, 6 F.3d at 1020.

The district court asserted that the tiered COLA has a "pernicious" effect on younger retirees because it "significantly reduc[es] their pensions when they [become] 65" (Doc. 167 at 29); the court's analysis, however, was incomplete and misleading. While it is true that a younger retiree's benefits will grow at less than 2.0% per year before he or she turns 65, they will begin to grow at the higher 2.0% rate as soon as the retiree reaches 65. Yet, in its conclusion about the COLA's allegedly "pernicious" effect, the district court looked only to the rate of benefit-growth before age 65 (*see id.* at 30) and wholly ignored the substantial extent to which the growth rate accelerates after 65. In short, in electing to frame the analysis as it did, the court dictated the conclusion that it would reach, but neither its framing nor its conclusion were correct.

Furthermore, if the court had considered the COLA's effect over a member's entire expected life, it could not reasonably have described the COLA as discriminatory. If, for example, an employee retires at 45 (as the district court

53

posited), but lives for the rest of his or her expected life (until age 78 for a man, and 82 for a woman),[21] he or she would progress through the several tiers. Thus, he or she would receive no COLA for the first 10 years, but a 1.0% COLA for the next 10, and a 2.0% COLA for the rest of his or her life – 13 years for a man, and 17 for a woman. As a result, the employee would ultimately receive a COLA at a blended rate of somewhere between 1.0% and 2.0% – which the district court held to be constitutionally permissible. *Id.* at 31. In these circumstances, the only material difference between a flat COLA at less than 2.0% and the tiered COLA is that, under the tiered COLA, the benefits are backloaded until the time when the member is likely to need them the most.[22]

In summary, the district court agreed that it was reasonable and necessary to replace the variable benefit with a COLA. The court even agreed that the City had expended an appropriate amount of money on the new COLA. The court simply disagreed with the City's legislative judgment about how best to allocate that

---

[21]        http://www.ssa.gov/oact/STATS/table4c6.html (last viewed April 26, 2013).

[22]        Nor is the ordinance discriminatory merely because some members had already reached the 1.0% or 2.0% level as of the effective date. If the system were required to treat all members equally regardless of age, it could not adopt new benefits for current employees without offering those benefits to the older beneficiaries who had not received them.

money among the various plan members.  The court erred in refusing to defer to that judgment and in substituting its judgment for that of the City's elected representatives.  *Baltimore Teachers*, 6 F.3d at 1022.

The City Council had many legitimate reasons for implementing the tiered COLA.  The City had only a limited sum of money, which, the district court found, would not support the desired goal of a 2.0% COLA for all retirees and beneficiaries.  Doc. 167 at 13.  Consequently, the Council considered but rejected the option of providing an across-the-board COLA of less than 2.0%.  It did so because it recognized that different retirees and beneficiaries are differently situated – that older members are, for example, likely to have the greatest need for a COLA, because they are unlikely to be able to work and more likely to have retired before the implementation of DROP.  In addition, the City Council adopted the unions' request for the new minimum benefit, which directed some funds away from the COLA to fund an increase in the basic benefits for the elderly widows of deceased members.

Simply put, in the exercise of its legislative judgment that it should allocate the greatest protection to the oldest and most vulnerable retirees and beneficiaries, the City Council adopted the tiered COLA, an idea that had originated with one of the union representatives on the Board of Trustees.  Tr. 2/2/12 at 197-99.  While

55

the district court disagreed with the Council's judgment, it had no "objective standards against which to assess" whether its proposed solution was superior to the one that the Council adopted. *Baltimore Teachers*, 6 F.3d at 1022. Certainly, the court could point to nothing in Contracts Clause jurisprudence that requires the City to treat all plan members equally. Indeed, one could easily say that had the City adopted a flat, across-the-board COLA at a constitutionally-permissible level of less than 2.0%, it would unfairly discriminate against the oldest and most vulnerable retirees and beneficiaries, who are typically aged, infirm, and unable to work, who do not have the opportunity to supplement their retirement benefits with income and social security, pension, or other retirement benefits from a second career, and who mainly retired before the adoption of the generous DROP benefit at a time when compensation (and thus the level of benefits) was markedly lower than it is today.

It is no answer to assert that the ordinance is imperfect in achieving its goals. The Contracts Clause does not require perfection. Once a court has concluded that the government impaired its obligations no more than necessary and that it did not consider impairing its obligations on a par with other policy alternatives, the Contracts Clause requires only that the impairment be reasonable

"'in light of the surrounding circumstances.'" *Baltimore Teachers*, 6 F.3d at 1020 (quoting *United States Trust*, 431 U.S. at 31). The ordinance satisfied that standard.[23]

It may well be that another approach was as reasonable (or even more reasonable) than the approach that the City Council adopted, but this is not to say that the Council acted unreasonably in doing what it did. As the First Circuit stated in another Contracts Clause case, the government "need not prove its choice the best among the available alternatives." *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 55 (1st Cir.), *cert. denied*, 525 U.S. 923 (1998). "Merely contending that there was a better way, [a plaintiff] has not carried its burden." *Id.*

Here, the City Council made a reasonable policy decision about how to allocate a limited pool of resources among the plan's retirees and beneficiaries. "'Whether the legislation is wise or unwise as a matter of policy is a question with which [the courts] are not concerned.'" *Buffalo Teachers*, 464 F.3d at 372

---

[23]    Quoting *Baltimore Teachers*, the district court condemned the ordinance because it "'narrowly target[s] [a] specific class[]'" of plan members, specifically, those less than 55 years of age. *See* Doc. 167 at 31 (quoting *Baltimore Teachers*, 6 F.3d at 1021). The court, however, failed to recognize that "narrow targeting" is relevant only to whether the City was inappropriately furthering some "special interest" (*id.*), which, the court had already concluded, the City was *not* doing. In any case, the younger retirees benefit from enhancing the system's actuarial soundness and have the opportunity to move through the tiers.

57

(quoting *Blaisdell*, 290 U.S. at 447-48). "Not only are [courts] ill-equipped even to consider the evidence that would be relevant to such conflicting policy alternatives; [they] have no objective standards against which to assess the merit of the multitude of alternatives." *Baltimore Teachers*, 6 F.3d at 1022. The district court, therefore, erred in concluding that Ordinance 10-306 was not a reasonable or necessary means of implementing an admittedly reasonable and necessary step in furtherance of an undeniably important public purpose.

### D. Because Plaintiffs Claim to Retain State-Law Contract Claims, They Have No Contracts Clause Claim

In *Crosby v. City of Gastonia*, 635 F.3d 634, 642 & n.7 (4th Cir.), *cert. denied,* ___ U.S. ___, 132 S. Ct. 112 (2011), this Court held that a state's breach of contract typically would not constitute the impairment of the obligations of contract. The *Crosby* Court reasoned that a party may assert a Contracts Clause claim only if a State both repudiates its contractual obligation and extinguishes the means of enforcing the obligation. *Id.* n.7. "If," by contrast, "the offended party retains the right to recover damages for the breach, the Contracts Clause is not implicated." *Id.*

Because plaintiffs claim to retain a state-law breach of contract action that arises from the enactment of ordinance, the City invoked *Crosby* to argue that they have no viable Contracts Clause claim. In response, the district court attempted to

58

distinguish *Crosby*, asserting that a party may assert a Contracts Clause claim if a state or locality uses legislation to eliminate its obligations under a public contract. Doc. 115 at 18.

The court's distinction is inconsistent with at least two federal appellate decisions: *TM Park Ave. Assocs. v. Pataki*, 214 F.3d 344 (2d Cir. 2000), and *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248 (7th Cir. 1996). In both cases, the governments enacted legislation that repudiated their obligations (*TM Park*, 214 F.3d at 347; *Horwitz-Matthews*, 78 F.3d at 1250), and in both the courts held that the plaintiffs had no Contracts Clause claim because they retained the right to sue for breach. *TM Park*, 214 F.3d at 348-50; *Horwitz-Matthews*, 78 F.3d at 1251. Indeed, in *Crosby* the Court quoted and followed Judge Posner's opinion in *Horwitz-Matthews*.

The Court, accordingly, should conclude that under *Crosby* plaintiffs have no Contracts Clause claim.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's conclusion that Ordinance 10-306 substantially impaired the obligations of contract in violation of the Contracts Clause.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Oral Argument is hereby requested.

Respectfully submitted,

_____/s/_____
James P. Ulwick
Kevin F. Arthur
Jean E. Lewis
julwick@kg-law.com
karthur@kg-law.com
jlewis@kg-law.com
Kramon & Graham, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202-3201
(410) 752-6030 (telephone)
(410) 539-1269 (facsimile)


_____/s/_____
George Nilson
Matthew W. Nayden
Baltimore City Law Department
100 N. Holliday Street
Baltimore, Maryland 21202
George.Nilson@baltimorecity.gov
matthew.nayden@baltimorecity.gov
410-396-5370 (telephone)

*Attorneys for Appellant*
  *Mayor and City Council of Baltimore*

Dated: April 29, 2013.

60

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

## **CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   this brief contains <u>13,903</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   this brief has been prepared in a proportional spaced typeface using <u>Word Perfect</u> in <u>14 point Times New Roman</u>.

_____/s/_____

James P. Ulwick

*Counsel for Appellant*

Dated:  April 29, 2013

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on April 29, 2013, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF System, which will send notice of such

filing to the following registered CM/ECF users:

Geoffrey M. Gamble
Charles O. Monk, II
SAUL EWING, LLP
500 East Pratt Street
Baltimore, MD 21202-3171

Robert D. Klausner, Esq.
KLAUSNER & KAUFMAN, PA
10059 NW 1st Court
Plantation, FL 33324

The necessary filing and service were performed in accordance with the

instructions given to me by counsel in this case.

_____/s/_____
Melissa A. Dockery
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street, Suite 230
Richmond, VA  23219